# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DONNA DOMINGUEZ, MARK KULIEKE,
JOHN BACOVSKY, MARY LAMIRANDE,
ROBIN NEARY, and MARY NOWAK,

    Plaintiffs,

  v.          Case No. 03-C-777

H.C. MILLER CO.,

    Defendant.

## DECISION AND ORDER

  Six individuals sued H.C. Miller, their former employer, for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (ADEA). As is common in such cases, the plaintiffs proceed not based upon direct evidence, e.g., a superior's statement that he wanted to hire younger people. Instead, as evidence the plaintiffs cite the fact that they and several others were all above 40 years old when they were terminated, which in their expert's view is statistically significant (i.e., suspicious) given the age distribution of H.C. Miller employees on the whole. They also argue that they were each performing their job duties adequately and that the reasons given by H.C. Miller are phony rationalizations intended to cover up the fact that they were really fired because of their age.

  H.C. Miller moved for summary judgment, arguing that several of the plaintiffs could not show either that they were performing their jobs satisfactorily or that younger workers were treated better. The company also argues that its business reasons for terminating each of the individuals

were legitimate and therefore not pretextual. For the reasons that follow, I find that there is a genuine issue of material fact with respect to plaintiff Dominguez and thus deny defendant's summary judgment as to her. As to the remaining plaintiffs, however, I conclude that they cannot demonstrate age discrimination and thus defendant's motion for summary judgment will be granted.

## I. Background and Employment Statistics

H.C. Miller, a printer of commercial index tabs, custom commercial binders and other paper business applications, was bought in 2000 by William Hayes, Ronald Demske, and Michael Schaefer. According to the new owners, the financial state of the company was somewhat precarious at the time they bought it, and the company's weak condition persisted into 2001. In early 2001, these circumstances led management to undertake a reorganization of the company and to begin laying off some employees. In March, the company laid off three employees who were aged 25, 33, and 48. All of the plaintiffs were terminated during the summer and fall of 2001. Mary Nowak (age 49) was terminated on June 18 and Mark Kulieke (52) was fired on August 8. John Bacovsky (55), Robin Neary (45) and Mary Lamirande (48) were laid off on October 19, and Donna Dominguez (54) was terminated as part of a restructuring program on November 30. While each of the six terminations involves facts germane only to the particular employee involved, all of the plaintiffs rely on statistical evidence intended to show that their terminations, when viewed in the more general context of H.C. Miller's ongoing business, were likely motivated by their age.

The plaintiffs retained experts who performed several statistical tests on H.C. Miller's employment data during various time periods. For example, in October and November 2001, during which four of the plaintiffs were terminated, 7 of the 8 terminations at the company (87.5%)

2

involved employees over age 40. Given the fact that roughly 55% of the company's workforce was over 40, the plaintiff's expert concluded that the chance age was *not* a factor in the terminations was extremely low (1.6%). In other words, given the age distribution of all H.C. Miller employees, one would expect that only 4 or 5 (not 7) of the 8 terminations would be 40 or over.[1] The expert also analyzed the data between June and November and reached a similar conclusion. During that period (beginning when Nowak was fired and ending when Dominguez was let go) 12 of the company's 14 terminations (85.7%) were persons 40 or over. One statistical test correlated age and the terminations at more than a 99% probability, while another test produced a probability just shy of 95%. As a result of these employment actions, during the six-month period analyzed by the plaintiffs, the company's payroll went from 118 to 122, while the percentage of workers aged 40 or older dropped from 57.6% to 51.6%. (Kennelly Aff., Ex. 23.)

For its part, the defendant also performed expert analysis. The company's expert, Dr. Donald Harnett, analyzed data occurring before and after the plaintiffs were terminated, casting a broader net than merely the six months during which the plaintiffs were fired. For instance, he included in his analysis the fact that the company had laid off 3 employees in March 2001 and 6 in January 2002. 7 of those 9 employees (77.8%) were *under* age 40. By including this (and other) data in his analysis, Harnett concluded that there was *no* statistical correlation between involuntary terminations and the age of the employees terminated.

---

[1]This is the so-called "null hypothesis." *See Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 424 (7th Cir. 2000).

3

## II. Individual Plaintiffs

Although the plaintiffs seek to show that their individual terminations were part of a larger company-wide phenomenon of age discrimination, because the circumstances of each termination are different it is necessary to describe the each plaintiff's case individually and to address the company's stated reasons for terminating each plaintiff.

### 1. Mary Nowak

Mary Nowak was hired on May 26, 1987 and was one of approximately 50 employees who worked in the Bindery Department. She worked on what was called a Scott machine, which is supposed to cut tabs at the rate of roughly 6,000 to 10,000 tabs per hour. In March 2001, after her supervisor was fired, Nowak came under the supervision of Thomas Zuelke. A week after becoming Nowak's supervisor, Zuelke met with her to explain his concerns about her performance. In written notes taken after the meeting, Zuelke seemed upset by her attitude:

> Went over Mary Nowak's performance report with her on 3/30/01. I explained to her that her production was not up to the standards set for the Scott 10M tab cutting machines. I also let her know that her indirect labor was very high. I told her that she needed to work on these two areas of her performance. Her reaction to this was strange it was like not a big deal. I guess I expected a more positive response. Her response seemed negative, like who cares.

(Zuelke Aff. ¶4, Ex. A.)

Zuelke believed that Nowak was artificially boosting her productivity figures (which the company kept track of) by essentially writing off a lot of her time to so-called "indirect labor" such as maintenance or lunch breaks. By writing off her time in that fashion, Zuelke believed she was able to make herself appear more productive than she actually was. In any event, Nowak apparently

4

did not improve her performance to Zuelke's satisfaction and Zuelke terminated her employment several weeks later on June 18. She was 49 at the time she was fired.

## 2. Mark Kulieke

Mark Kulieke, 52, was hired in 1996 as a customer sales representative. In January 2001, the company offered him a position as an "estimator," a job that is not well-explained by the parties, but which apparently involved less human interaction and customer communication than a sales rep job would. (Kulieke Aff., ¶ 22.) In any event, although he received a $2.00 per hour raise in advance of actually assuming the position, within a few months (according to the company) economic forces reduced the need for a new estimator position and Kulieke continued on in his position as a customer sales rep. Around the same time, a new supervisor, Amy Burkett, was hired to run the customer service department. Burkett supervised Mark Kulieke for approximately seven months and concluded that he had fatal communication problems, a factor which had been documented in numerous personnel reports throughout the years, although more recent reviews had been more favorable. Burkett also viewed him as not being a team player and failing to pitch in when extra work was required. On August 10, Burkett terminated Kulieke's employment. In meeting with him, she first noted that the needs of the company had changed and that there was no longer an estimating job open for him; she then told him that his communication skills were inadequate for a service representative job. (Peterson Aff. ¶ 48, Ex. H.)

## 3. John Bacovsky

John Bacovsky, 55, was a press operator with several decades of experience at the time he, Mary Lamirande and Robin Neary were laid off on October 19, 2001. The owners claimed that the terrorist attacks of 9/11 had caused a sudden and swift downturn in business, which necessitated the

5

layoffs. The owners were themselves not involved in deciding whom to lay off, but instead charged human resources and management staff with making those decisions.

Bacovsky's supervisor of eight years, Steve Gauthier, stated that he chose Bacovsky for layoff because he was only able to operate one of the presses used by the company, whereas several other employees had training on other kinds of presses. He also claimed Bacovsky's attitude was poor and that Bacovsky was "constantly bashing the company." (Gauthier Aff. ¶ 10, Ex. A.) In addition, there was a perception that Bacovsky was unwilling to "cross train" on the other machines and that he preferred taking voluntary layoffs during slow times rather than improving his work skills by training on other machines.

### 4. Robin Neary

Robin Neary, 45, had been with the company for four years when he was selected by Gauthier to be laid off on October 19. Gauthier's stated reason for selecting Neary was the fact that another employee, Joseph Ferrier, performed better on the same machine and was able to handle more machines than Neary could. He also had a better attitude. Gauthier had a run-in with Neary just 10 days before the termination, when Neary was given a disciplinary suspension due to an error he made; when confronted, Neary walked away from Gauthier and slammed the door, exclaiming, in response to criticism, "if that's the case, then they can fire my ass." (Gauthier Aff. ¶ 22, Ex. C.) While Neary was walking to the termination meeting, however, Gauthier informed him that the meeting was not prompted by that event.

### 5. Mary Lamirande

Mary Lamirande, 48, had been a machine operator at the company for seven and one-half years when she was selected for layoff on October 19, 2001. Like Mary Nowak, her immediate

supervisor since March of that year had been Thomas Zuelke. Zuelke, himself the same age as Lamirande, stated that he chose her for layoff in lieu of Bruce Mattern, who was 54 years-old. Although Lamirande had received good performance reviews in the past, Zuelke states that he believed Mattern better qualified and more efficient than Lamirande. At the time of her termination, however, she was told that her performance was not an issue in the decision.

### 6. Donna Dominguez

Donna Dominguez, 56, worked out of her home in Milwaukee as one of the company's five sales representatives. Three other reps worked in the Green Bay office, while another, Greg Krawchuk, worked in Philadelphia. On November 30, 2001, both Dominguez and Krawchuk were let go. Jim Beauvais (43), another sales associate, was also fired on the same day for performance reasons. The company claims that its legitimate reason for letting Dominguez (and Krawchuk) go was that William Hayes, one of the owners, wanted to restructure all of its sales force so that they were located in Green Bay, rather than in Milwaukee or anywhere else. It was not suggested to either Dominguez or Krawchuk that they could move to Green Bay to save their jobs.


### III. Analysis

The ADEA makes it illegal for an employer to discharge, refuse to hire, or otherwise discriminate against an employee aged 40 or over because of that individual's age. 29 U.S.C. §§ 623(a), 631(a); *Richter v. Hook-SupeRx, Inc.,* 142 F.3d 1024, 1027 (7th Cir. 1998). "To succeed in an ADEA claim, a plaintiff must establish that he would not have received adverse treatment but for his employer's motive to discriminate on the basis of his age." *Richter,* 142 F.3d at 1027.

As suggested at the outset, the six plaintiffs proceed based on the indirect burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973), under which they may prove discrimination "by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.' " *Cerutti v. BASF Corp.,* 349 F.3d 1055, 1060-61 (7th Cir.2003) (quoting *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994)). The *McDonnell Douglas* analysis requires employees claiming a violation of the ADEA to show that: (1) they are members of a protected class; (2) they were meeting the employer's legitimate expectations; (3) they were discharged and not rehired or promoted; and (4) the positions remained open or were filled by someone substantially younger. *See, e.g., Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617 (7th Cir.2000).[2] In the case of a "mini-RIF," such as is the case with respect to some of the plaintiffs here, employees remaining at the company absorb the duties of their former co-workers. *Krchnavy v. Limagrain Genetics Corp.,* 294 F.3d 871, 876 (7th Cir. 2002). In a mini-RIF situation, the fourth prong requires a plaintiff to

---

[2]The defendant's arguments maintain that retained employees must be "similarly situated" to the terminated employees, but that requirement is found only in an actual RIF situation, where "the fourth element can also be satisfied by showing that similarly situated, substantially younger employees were retained." *Lesch v. Crown Cork & Seal Co.,* 282 F.3d 467, 472 (7th Cir. 2002). In a traditional RIF, the employee's position and his work are eliminated, whereas in a mini-RIF the job is eliminated but the work still remains and is redistributed to other employees.

> Ultimately, calling an adverse employment action a "mini-RIF" merely emphasizes that McDonnell Douglas, rather than the RIF test, should apply. In both the traditional McDonnell Douglas analysis and the mini-RIF analysis, the discharged employee's duties are assumed by other employees (or in the mini-RIF scenario, the position is absorbed by other employees); in the RIF context, the employer no longer needs the discharged employee's duties performed.

*Michas v. Health Cost Controls of Illinois, Inc.,* 209 F.3d 687, 693-94 (7th Cir. 2000). The terminations here are more in line with the mini-RIF analysis, and so I will determine not whether any other employees were similarly situated, but merely whether they were younger and whether they assumed the plaintiffs' workload.

8

"demonstrate that his duties were absorbed by employees who were not members of the protected class."

If the employees make out this *prima facie* case, the burden then shifts to the employer to come forth with a legitimate, nondiscriminatory reason for the employment action. If it does so, the burden then shifts back to the plaintiff to show that the reason or reasons offered by the employer are pretextual, i.e., not worthy of credence. "To show that an employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that the employer made a mistake . . . . Instead, the plaintiff must demonstrate the employer's reason is unworthy of belief." *Koski v. Standex Int'l Corp.,* 307 F.3d 672, 677 (7th Cir. 2002). To do this, the plaintiff may show that the proffered reasons were: (1) factually baseless, (2) not the actual motivation for the discharge, or (3) insufficient to motivate the discharge. *Id.* While *McDonnell Douglas* establishes that courts must proceed down this well-worn path, a court must not lose sight of the ultimate issue, namely that "the plaintiff must demonstrate that the employer would not have made the adverse employment decision in question but for his membership in a protected class." *Cerutti,* 349 F.3d at 1061-62.

H.C. Miller brings a three-pronged attack on the plaintiffs' evidence. First, it claims that several of the plaintiffs were not performing their jobs satisfactorily and thus that they were not meeting the employer's legitimate expectations, the second factor of the *prima facie* case. Second, it claims that several of the plaintiffs do not meet the fourth prong of the *prima facie* test because they were not replaced by younger employees at all; their positions were simply assimilated into the general workload of the company. Third, in a variation on the theme of its first argument, the company claims that its reasons for terminating the plaintiffs' employment were legitimate business

9

reasons (either performance-based or economic) and that the plaintiffs cannot show that those reasons were pretextual.

This final point–pretext–often proves dispositive of a plaintiff's claim, and given the significant overlap between pretext and other aspects of a *prima facie* case, it is tempting to focus solely on the issue of pretext. *See Olsen v. Marshall & Ilsley Corp.,* 267 F.3d 597, 600-01 (7th Cir. 2001)("We choose to [focus on pretext] here not because we are convinced that Olsen has established the *prima facie* case of either of his claims, but because our *prima facie* case analysis would overlap substantially with the question of pretext.") Indeed, it appears the Seventh Circuit takes this approach as a matter of course. *See, e.g., Lesch,* 282 F.3d at 472 ("It is not always necessary to march through this entire process if a single issue proves to be dispositive. Here, as is often true, that issue is pretext or the lack thereof.")  However, the Seventh Circuit has not sanctioned such an approach for district courts, instead requiring courts to first establish whether a plaintiff has succeeded in demonstrating a *prima facie* case. *See Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 273 (7th Cir. 2004)("'[T]he *prima facie* case is the condition precedent to the pretext analysis' and should not be bypassed.") (quoting *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir.1997)).

Accordingly, I will proceed as follows.  First, I will address the statistical evidence the plaintiffs believe is common to all of their cases.  Then, I will address each plaintiff's case individually and determine whether he or she meets the *prima facie* case test and whether he or she can establish pretext.  In sum, I conclude that while several of the plaintiffs can establish a *prima facie* case, none of them, with the exception of Dominguez, can establish pretext because neither the statistical evidence nor the other circumstantial evidence they put forth would allow a jury to

10

reasonably conclude that H.C. Miller's stated reasons for terminating them were pretextual, i.e., not worthy of credence.[3]

## 1. Statistical Evidence of Age-Based Layoffs

Although they are not bringing a "pattern or practice" claim, see *Adams v. Ameritech Services, Inc.,* 231 F.3d 414, 422 (7th Cir. 2000), the plaintiffs use statistical evidence in an attempt to bolster their individual claims of discrimination. In other words, by showing that older employees were terminated at a much faster clip than younger ones, they attempt to show that H.C. Miller was engaged in a systematic pattern of laying off or firing older workers. This, if proven, would cast substantial doubt on the reasons now given by the defendant for those terminations. The defendant counters with statistical evidence of its own, which would show that there was no correlation between age and involuntary terminations at the company.

The central dispute is not which statistical tests should be used but what set of data should underlie those tests. The plaintiffs prefer to focus on the short period between June and November of 2001, a stretch of time in which the company terminated older employees at a 6-to-1 ratio (12 out of 14 terminations) to younger employees. On the other hand, the defendants want to include the March 2001 and January 2002 layoffs (in which only 2 out of 9 terminations were 40 or older) in the data, which they claim would tip the scales the other way against a finding of age discrimination. To the same end, they also want to include employment data stretching through April 2003.

"The Supreme Court has emphasized the importance of looking to the proper base 'group' when making statistical comparisons and examining all of the surrounding facts and circumstances which create the statistics themselves." *Balderston v. Fairbanks Morse Engine Div. of Coltec*

---

[3]Implicit in my finding that the employer's stated reasons for termination are not pretextual is my finding that they are legitimate, nondiscriminatory reasons.

11

*Industries,* 328 F.3d 309, 319 (7th Cir. 2003)(citing *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308, 312 (1977)).  Clearly, statistical evidence can be misleading if the underlying data being analyzed do not accurately represent the extent of the phenomenon being described, e.g., if data are cherry-picked or if they are selected arbitrarily.  A number of reasons counsel that the June-November period analyzed by the plaintiffs is not the only relevant period at issue here, and for that reason the conclusions reached by the plaintiffs' statistical expert are misleading.  For instance, the first of the plaintiffs' terminations (Mary Nowak) occurred on June 18, but that event reflected the warnings Thomas Zuelke had given to Nowak in March.  At that time, he expressed disappointment with both her productivity and her attitude, and that is why he later claimed to have fired her.  Since her argument is that the employer's stated reasons for her termination are a sham, and since the genesis of those reasons occurred in March, it makes no sense to pretend as if the June 18 termination came from out of the blue.  That is, if Nowak is to win her pretext argument, it will be because the warnings given to her in March, which were then cited in her termination, were *themselves* a pretextual setup for her future termination; they rise and fall together.  Thus, if the company was discriminating against Nowak because of her age, it was doing so not just in June but in March as well.

Moreover, much of the plaintiffs' own evidence explicitly underscores the fact that we are dealing with a time period broader than merely the six months between June and November. Indeed, the plaintiffs are quite willing to delve into the company's employment data before June 2001 when it suits them: for instance, Mark Kulieke's theory of discrimination suggests that the company hired a younger replacement estimator in *January* 2001 who was groomed to take his place.  (Pltf. Br. at 88.)  And, in Mary Lamirande's ERD complaint, she alleges the company was engaged in a "10 month project" to eliminate older workers and hire younger ones.  (O'Keefe Aff.,

12

Ex. L.) It is thus evident that the plaintiffs's own case is based on a period of discrimination longer than the six-month period they emphasize, and they have offered no rational basis for relying only on data from that period. Apparently, they elected to include only the data set that supported their case while excluding other potentially relevant data which not only fail to support their theory but arguably refute it. To exclude from consideration the fact that 7 of 9 other employees terminated in close proximity to the plaintiffs (March 2001 and January 2002) were *under* age 40 obviously skews the results significantly.[4] Plaintiffs' experts' conclusions thus reveal nothing about whether or not there was a general pattern of age discrimination going on at H.C. Miller, and I therefore do not find that their experts' conclusions support their case.

This is not to say that the defendant's expert analysis is wholly convincing either. For instance, because the expert's conclusion rests upon some data occurring after the defendants were on notice of the ERD age discrimination complaint, it could reflect the company's attempt to skew the data in the opposite direction (something better left to a finder of fact). Thus, I will rely on neither the plaintiffs' nor the defendant's expert data in determining whether any of the six plaintiffs were terminated because of their age.

In addition, one further point bears some discussion. While the plaintiffs purport to show a discriminatory pattern engaged in at the company (albeit during a compressed time frame), they never tie their statistics to any individual decision-makers. Thus, even were I to accept their

---

[4]The plaintiffs argue that employment activity in January 2002 should not be counted because they filed the first of their administrative complaints on January 22, 2002, meaning that the defendant by then was on notice that it had to clean up its act and hire or retain more older workers. But the plaintiffs do not dispute that the defendant did not receive notice of the complaint until some time after February 5, which is when the Equal Rights Division first notified the company about the administrative complaint. (Peterson Supp. Aff., ¶ 5.) Thus, there is no evidence that the January 2002 layoffs were window dressing to cover up the company's discriminatory practices.

13

analysis at face value, the evidence does nothing to shed light on the motivations of the several different individuals who decided to terminate the people in question. The decisionmakers involved here were Thomas Zuelke, Amy Burkett, Steve Gauthier, William Hayes, and Lynn Peterson, the HR director. Thus, unless the plaintiffs could link those different decisionmakers together in either logic or purpose, any other factual similarities carry little probative value. *See Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 508 (7th Cir. 2004)(quoting *Timms v. Frank,* 953 F.2d 281, 287 (7th Cir.1992) (reasoning that "it is difficult to say that the difference was more likely than not the result of intentional discrimination when two different decision-makers are involved")). Thus, even if we were to use the time frame preferred by the plaintiffs, they offer little evidence to suggest that the termination decisions were coordinated and therefore anything other than statistical chance.

In addition to their statistics-based arguments, however, the plaintiffs also offer evidence particularized to each plaintiff to support their *prima facie* cases and to suggest that the defendant's stated reasons for terminating them were pretextual, i.e., not worthy of credence. I discuss each plaintiff individually below. As to the plaintiffs' *prima facie* case, the defendant concedes that each is a member of the protected class (40 years old or older) and that each was terminated and/or not rehired. Thus, the only issues are whether the plaintiffs were performing the employer's legitimate job expectations (the second prong) and whether younger employees were treated better (the fourth prong). As for pretext, the plaintiffs are severely hampered by my conclusion that their statistical evidence is fundamentally unpersuasive, i.e., that it does nothing to call into question the employer's stated reasons for each of their terminations. As will be seen, the plaintiffs' pretext arguments, again with the exception of Dominguez, amount to little more than subjective disagreements about their job performance and/or Monday morning quarterbacking of the personnel and business affairs of the company.

14

**2. Mary Nowak**

**A. *Prima facie* case**

H.C. Miller argues that Nowak failed to meet its legitimate expectations because of the concerns noted by Thomas Zuelke, namely, that her indirect labor was too high and her output too low. Nowak argues that her performance was not terribly deficient at all and that, if it was, it was due to maintenance problems with her machine. In support of this argument, she cites several notations on her time sheets which indicate that there were "feed problems," "jamming problems," and "mylar jamming." (Nowak Aff. ¶ 14, Ex. C.) On one occasion, for instance, an employee named Ivan Buck apparently spent an entire hour fixing her machine. In all, she notes, Buck had helped fix her machine some five times in two and one-half months, thus accounting for the maintenance problems that caused her lack of productivity and output. In addition, as an apparent throw-in argument, she also notes that one of her duties was to check first aid supplies every two weeks, an activity that was also charged as indirect time. Thus, given the machine she had to work with and her first aid duties, she claims she was adequately performing her job.

The company notes, however, that even assuming her machine was not perfect, the occasional problems she reported do not even begin to approach the amount of down time that Thomas Zuelke noted when he terminated her in June. In his post-termination memorandum, in fact, he noted that Nowak had some 210 hours of indirect time—nearly 26 days' worth—in 3 months of employment. Nowak has no explanation that ties her occasional maintenance issues (a few hours, at worst) or her first-aid duties to the fact that she had so much indirect time, which was Zuelke's stated reason for terminating her. Accordingly, I find that she has not established that she was meeting her employer's legitimate expectations and that she has failed to establish a *prima facie* case.

**B. Pretext**

Even if she could establish her *prima facie* case, Nowak cannot establish that the employer's reason for terminating her was pretextual. Her burden is not to show merely that, all things being equal, someone *else* should have been fired (i.e., that she was only the second- or third-least productive employee). At best, such an argument constitutes a mere disagreement with the termination decision, something one would expect most fired employees to be able to articulate with some ease. Instead, she must show that her employer's stated reasons for firing her are false. "[W]e deal with small gradations, with an employer's subjective comparison of one employee to another, and it is incumbent upon us to remember that what is at issue is not the wisdom of an employer's decision, but the genuineness of the employer's motives." *Testerman v. EDS Tech. Prods. Corp.,* 98 F.3d 297, 304 (7th Cir.1996). While she compares herself to others and attempts to explain away her indirect time, both of those efforts come up substantially short. While she claims that other, younger, employees also had significant indirect time and were not fired, she has cited only one individual, Idie Herlach, who had more indirect time. Herlach, however, also had significantly more direct (productive) time than Nowak. None of the other individuals she cites had anywhere near the amount of work on the same machine as Nowak. (Pltf. Br. at 46.) Nor has she provided any reason to question Zuelke's concerns about her indirect time, which she cannot account for. Thus, none of Nowak's evidence could allow a reasonable jury to conclude that the employer's reason–her inefficiency–was not genuine.

**3. Mark Kulieke**

**A. *Prima facie* case**

Kulieke's claim is two-fold. First, he claims that although he had never worked as an estimator, he was actually fired from the estimating position (not customer service) because he had

16

been promoted to that position and was receiving higher pay reflecting that promotion. The promotion was put on hold, however, because (he claims) he was needed as a customer service rep until his accounts were taken over by someone else. But once the company hired a replacement for his customer service job in July, he argues that he was essentially an estimator at the time he was fired. (The defendant calls this argument a "quagmire of illogic," and it is difficult to disagree.) In any event, construing the argument generously, Kulieke's claim could be interpreted as being based on the company's failure to actually promote him to estimating.

To that extent, Kulieke needs to show that (1) he applied for the position; (2) was qualified for it; (3) was rejected; and (4) and another person, not in the protected class, was hired for the position or that the position remained open. *Rudin v. Lincoln Land Community College,* 420 F.3d 712, 724 (7th Cir. 2005). I assume that because Kulieke was promoted to the estimator position (at least on paper) that he was qualified for it. But was a younger person hired for his position? He highlights the fact that the company hired Michael Leamy (age 32) at about the same time (January) for a second estimator position. Because Kulieke needed to stay in customer service while a replacement was being sought, he did not do any estimating work, leaving Leamy as the only new estimating hire. Then in the interim, according to the company, the need for Kulieke's position dried up and Kulieke was left in a sort of limbo. Hence, he was passed over for the now-unnecessary estimating job. This does not satisfy the fourth prong because there is no evidence either that the position remained "open" or that Leamy was hired for *Kulieke's* position–instead, he was hired for a completely independent position around the same time as Kulieke. Accordingly, Kulieke has failed to establish a *prima facie* case on this theory.

Kulieke's alternative argument is that he actually was a customer service rep at the time he was fired. This is more sensible since Amy Burkett, the head of customer service, was the

17

individual who decided to terminate Kulieke and the one who actually did it. Moreover, according to Kulieke's own ERD complaint, "he was terminated while still holding his longstanding Customer Service position of 5 years duration." (O'Keefe Aff., Ex. L.)

To the extent Kulieke was fired from a customer service (not estimating) position, he is able to show that he was meeting his employer's legitimate expectations in that job. He states that he had good performance reviews in the past, and indeed his more recent reviews were decent, although communication problems were commonly noted. Because the *prima facie* standard is not a high one, I find that he has at least met this hurdle. Similarly, he claims he was replaced in customer service by a woman 28 years his junior. The defendant does not offer much resistance to the fact that Kulieke was replaced by a substantially younger person, and thus for *prima facie* case purposes I find Kulieke has met his burden.

## B. Pretext

The fact that an employee was adequately performing his job does not in any way rule out a finding that the employer was nevertheless justified in terminating him. The reason for termination given by Burkett was Kulieke's communication problems. Kulieke counters that by highlighting his past reviews, but nearly any employee could cobble together bits and pieces of old reviews and portray them as rosy. Having good employment records does not mean an employee has excellent communication skills. Importantly, Kulieke does not dispute the fact that, as far back as 1998, his previous supervisor had recommended him for termination in the event the company needed to make budget cuts. A written memorandum from September 17, 1998, indicates that the supervisor singled Kulieke out from the other staff for potential termination, noting:

> In the past there have been complaints from our sales staff . . . about the lack of communication as well as no sense of urgency. Also, we have had customers complain about the same things. This lack of communication has not only caused

18

spoiled work in dollars but has also caused HCM to stop production on other jobs in order to produce his jobs because the ship jobs had been changed and production was never made aware of those changes. Chaos creates spoilage.

(Peterson Aff., Ex. G.) The supervisor then contemplated whether remaining staff could pick up Kulieke's workload and whether there would be any detriment to the customers. "I don't believe that eliminating Mark will have a negative effect on his customers, I don't sense that there is any rapport between the customers and Mark." (Id.)

Subsequent evaluations improved, as already noted, but again the question is not whether he was doing a good, or adequate job–that is part of the *prima facie* case, after all–but whether the employer's stated reasons for terminating him are false. Given the fact that communication issues had been a documented factor for years, Kulieke cannot show that it does not constitute a believable reason for his termination.[5]

To the extent he brings a claim based on his being passed-over for the estimator position, that claim also fails. To succeed in showing pretext, he would have to show that the reasons for not following through on his promotion are not worthy of credence. The reason the company gives is economic–i.e., after hiring him (and another person) for estimating positions in late 2000/early 2001, business slowed and there was not enough work: the "needs" of that department had changed, according to the statement read to him when he was fired. In the meantime, he was replaced at his customer service position and, caught in the middle, he was singled out for termination.

_____

[5]He also notes that Burkett herself has not filed an affidavit in this case, suggesting that her reasons for terminating him are inadmissible hearsay. But part of the evidence is the statement she read to Kulieke when she terminated him, and he thus must grapple with that statement as the company's stated reason. That reason, again, is backed up by documentary evidence stretching back for years, and Kulieke therefore fails to show pretext for being terminated as a customer service representative.

19

Kulieke claims that the testimony of Tom Nier, the estimating supervisor, contradicts the company's claim that its needs had changed. Nier's testimony does no such thing. He suggested that the department was busy and that he could have used additional help, but that is true of most business departments in most companies. That is not the same as saying that an additional position was warranted. There is thus nothing in the evidence that would call into question the company's explanation for not giving him the estimator position.

## 4. John Bacovsky

### A. *Prima facie* case

Bacovsky, Neary and Lamirande concede that the company experienced at least a temporary economic downturn following 9/11, and the company claims that economics was the primary reason for their termination. Thus, the company concedes that Bacovsky was at least performing his job adequately, but it argues he cannot demonstrate a *prima facie* case because he cannot show that any younger employees were treated better.

Bacovsky relies largely on a "statement" of a former co-worker, Kristine Plamann, who told the plaintiffs' attorney that Bacovsky's duties were assumed by two younger workers after Bacovsky was terminated. (2d Kennelly Aff., Plamann Statement at 14-15.) Although not subjected to cross-examination, the statement was made under oath and may therefore be considered on summary judgment. There is also some question, however, whether Plamann, a marketing employee, had any direct knowledge of the goings-on in the press department where Bacovsky worked. I nevertheless conclude that her statement is sufficient to establish for summary judgment purposes that Bacovsky's duties were at least in part assumed by younger employers and that he has therefore established a *prima facie* case. Accordingly, I proceed to consider his claim that the employer's stated reasons amount to a pretext.

20

**B. Pretext**

Bacovsky's argument on pretext fails. Because he admits that economics played a primary role, his claim of pretext is limited to challenging the reasons that he was singled out for layoff, which, as noted earlier, is not the same as arguing that the reasons given by the company are entirely accurate. *See Walker v. Glickman,* 241 F.3d 884, 890 (7th Cir.2001)("[T]he court's role is not to determine whether [the employer's] decision was right, but whether [the employee] presented sufficient evidence that [the employer's] reason was a lie for the action it took."). For instance, Bacovsky claims he never bashed the company (as Gauthier believed) and that he had at some point made it clear to the owners that he was willing to cross train on other machines. Even if true, however, it does not counter the fact that *Gauthier*'s impression of him was (1) that he had a bad attitude and (2) he preferred to go home instead of training on other machines (which Bacovsky does not dispute). That is, Bacovsky does nothing to undermine the veracity of the unfavorable impression that Gauthier, the decisionmaker, had of him. More importantly, he does not dispute the central justification for the layoff offered by Gauthier, which was his inability to work on other machines. In sum, Bacovsky attacks only the wisdom of the decision to terminate him rather than the legitimacy of the motivation behind that decision. *Ritter v.* 231 F.3d 1039, 1044 ("Pretext is not shown merely by demonstrating that [the employer] erred or exercised poor business judgment; instead Ritter must establish that [the employer] did not believe the reasons it gave for eliminating his position.")[6] That is not enough to establish pretext.

---

[6]To the extent Bacovsky brings a failure to rehire claim, that claim is precluded because it was not presented to the ERD or the EEOC. The ERD claim, Exhibit L, is found at page 38 of attachment 4 to the affidavit of Charles O'Keefe. *See Ritter,* 231 F.3d at 1045 (claim of failure to rehire plaintiff to other positions cannot be raised because they were never presented in his charge of discrimination with the EEOC); *Sauzek v. Exxon Coal USA, Inc.* 202 F.3d 913, 920 (7th Cir. 2000)("an employer's decision to terminate a worker is a separate and distinct act from a subsequent

21

**5. Robin Neary**

**A. *Prima facie* case**

Like Bacovsky, Neary admits that the company was experiencing financial difficulties following 9/11 and that the layoffs were economically justified (in the abstract). The company, for its part, concedes that Neary was essentially performing his job adequately. It disputes, however, the idea that his position was taken over by any substantially younger workers. The stated reason for selecting Neary was that Joseph Ferrier (age 36) could perform better, and the defendant relies on the fact that, in this circuit, an age difference of less than 10 years (Neary was 45) is presumptively insufficient. *Fisher v. Wayne Dalton Corp.,* 139 F.3d 1137, 1141 (7th Cir. 1998). If the age disparity is less than 10 years, "the plaintiff still may present a triable claim if she directs the court to evidence that her employer considered her age to be significant." *Hartley v. Wisconsin Bell Inc.,* 124 F.3d 887, 892 (7th Cir.1997). There is no such evidence here. The plaintiff's only evidence is of the indirect variety, and its pretext arguments are based not in showing that the employer was concerned about age but merely that its stated reasons are false (from which a jury could then surmise that age was a factor). In truth, there is almost nothing at all actually related to age in the evidence. As the Seventh Circuit noted in a similar case, "9.5 [years] is pretty close to 10, and where a plaintiff just misses the 10-year mark, he can still present a triable claim if he directs the court to evidence that his employer considered age to be a significant factor. But all Radue has are his statistics, the shortcomings of which we discussed above." *Radue v.*

---

decision not to rehire that employee during a recall.")

*Kimberly-Clark Corp.,* 219 F.3d 612, 619 (7th Cir. 2000). Accordingly, Neary cannot show that his position was absorbed by someone substantially younger.

**B. Pretext**

Even if he succeeded in his *prima facie* case, however, Neary would fail on pretext. Neary disputes many of the company's reasons for firing him, although because, like Bacovsky, he concedes there was an economic reason for the layoffs his arguments are limited to disagreements about who was best performing his job at the time of the layoffs. He claims that he could in fact operate all of the company's presses and that he was "certainly as qualified" as Joseph Ferrier, whom Steve Gauthier believed was preferable, in overall job performance since they "both received ratings of satisfactory in all areas." (Pltf. Br. at 78.) He also claims that his amount of "spoil work" was less than Ferrier's, meaning that Neary was the "better" employee. This is the extent of his argument that the reasons given by Gauthier–attitude, and better performance by Ferrier–are unworthy of credence. An employee's own subjective belief that he was better qualified is not enough to create an issue of fact on pretext. *Curby v. Solutia, Inc.,* 351 F.3d 868, 874 (8th Cir. 2003); *Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 733 (7th Cir. 2001).

Notably, Neary does not address the fact that he slammed the door and told Gauthier that the company could "fire his ass" just 10 days earlier. Apparently when terminating him Gauthier stated that the termination was unrelated to that incident; but it certainly bolsters Gauthier's stated reason for choosing Neary, namely, that his attitude was an issue. It would be odd indeed to hold that an employee could yell at his boss and then later claim that his boss is lying when he says the employee had an attitude problem. Taken in the most favorable light, Neary's argument suggests that he was roughly equal in skill to other employees, but once again, this is simply an argument

23

about the wisdom of firing him, not the legitimacy of the underlying motivation. There is absolutely nothing in the record to suggest that Gauthier's stated reason for firing him was bogus.[7]

## 6. Mary Lamirande

### A. *Prima facie* case

Again, because there is no dispute that economic factors were behind Lamirande's layoff, the *prima facie* issue comes down to whether younger employees absorbed her work.[8] Lamirande argues she was "constructively replaced" by younger workers who took over the work she did in strip reinforcing. For that proposition, she relies on the HR director's statement that three younger employees "would fill in occasionally" after she was laid off, which is not sufficient in a mini-RIF context like this. *Bellaver v. Quanex Corp.,* 200 F.3d 485, 495 (7th Cir. 2000). Indeed, there is evidence that *older* employees also took over some of her work. (Peterson Aff. ¶ 56.) Thus, Lamirande has no evidence that her position was actually assumed by younger employees.

### B. Pretext

Lamirande also fails the pretext analysis. Because she admits that economics made the October layoffs necessary, Lamirande largely reduces her pretext argument to a questioning of Thomas Zuelke's decision making process. Zuelke stated that he chose her over another employee, Bruce Mattern (age 54), because he viewed Mattern as more efficient and more capable of

---

[7]To the extent that he claims the company should have rehired him, and to the extent such a claim is liberally discernible from his ERD complaint, the same logic applies. There is no requirement to rehire employees the company chose to lay off, especially when the decisionmaker picks the individual based on reasons related to performance.

[8]The defendant claims she was not meeting expectations, but that argument seems more apropos of its reason for selecting her for the layoff and will be addressed later.

multitasking. Lamirande does not dispute this distinction, but instead complains that the company retained several much younger workers, many of whom were recently hired and had almost no experience at all. Essentially, she questions why Zuelke's decision came down to herself and Mattern when there were others with much less experience who should have been let go.

Because Lamirande does not challenge the legitimacy or truthfulness of the decision to terminate her (conceding that Mattern was better qualified), her arguments that others should have been considered for layoffs instead go, once again, to the wisdom of the decision making process rather than pretext. Lamirande does not argue that Zuelke is lying when he says he chose her because Mattern was better qualified, she instead questions the wisdom having the decision come down to her and Mattern in the first place. But that is essentially arguing that Zuelke made an incorrect decision based on wrong assumptions or an erroneous assessment of the workforce, not evidence that would allow a reasonable fact finder to conclude he was lying about his reasons for selecting Lamirande. Indeed, her case is similar to the situation addressed in *Ritter v. Hill 'n Dale Farm,* where the court rejected such arguments:

> In attempting to show pretext, Ritter acknowledges that an economic downturn required cutbacks at the farm. Ritter, however, disputes HND's reasons for selecting his position to eliminate and contends that HND actually targeted his position because of his age. In support, Ritter asserts that other duties could have been shifted to him and that other younger employees could have been fired; . . . Ritter did not establish pretext. Ritter's assertion that HND could have dismissed other employees and shifted new responsibilities to him merely challenges HND's business judgment.

231 F.3d 1039, 1044 (7th Cir. 2000). Accordingly, I find that Lamirande has not sufficiently shown that the reasons given by the employer for terminating her were unworthy of belief.

25

**7. Donna Dominguez**

**A. *Prima facie* case**

The company does not strongly challenge Dominguez's job performance, but it does dispute whether she was replaced by a substantially younger employee. Greg Herlihy picked up most or all of her accounts and was only 26 at the time he was hired. The company protests that he was not similarly situated to Dominguez, but that factor only comes into account in a true RIF situation, which this is not. (See footnote 2.) Accordingly, I find that Dominguez has established a *prima facie* case of age discrimination.

**B. Pretext**

Dominguez claims that the company's stated reason for firing her–its desire to have all sales employees under one roof in Green Bay–is a sham. Miller's explanation of the restructuring is as follows: William Hayes, one of the owners, "believed that the combination of customer service and relationships was the 'value discipline or proposition' that distinguished HCM from its competitors," and that "in order to educate the sales force on this value proposition, Hayes believed it was necessary to have all sales staff working in one central location." (Reply Br. at 21, n.16.)

I first note that, on its face, this explanation seems to rely more on vacuous business jargon than anything else. Certainly customer service and customer relationships are an important "value proposition" to any business, but Miller's stated reason for the restructuring fails to show why having sales staff under one roof would be necessary to "educate" the staff (including Dominguez) about that fact. Thus, the employer's stated reason for the restructuring seems at least questionable on its face.

If that were the only problem with Miller's explanation, to deny it summary judgment on that basis might constitute an unwarranted second-guessing of the wisdom of Miller's business

26

decision. But Dominguez also points out a troubling omission of the company, namely, that it did not offer her the chance to move to Green Bay and work from that office. It is true that fired employees generally have no basis to suggest what their employers "should" have done, and the employer is under no obligation to accommodate employees' own subjective judgments about their job performance or placement. But when the employer's own actions do not correspond to their words, their actions can implicate the *credibility* of the employer's explanation rather than the wisdom of the decision itself.

For example, suppose H. C. Miller decided it wanted its sales employees to dress in H. C. Miller corporate wear when they made sales calls. To achieve that goal, the logical course of action would be to ask employees if they would do so, or to simply circulate a memorandum to that effect, issue a new policy, or the like. In fact, one would be surprised to learn the employer chose to institute its new corporate clothing policy by simply firing its sales force and hiring new employees who would wear their clothing. Because that course of action is so unusual, a court might well conclude that the employer's motives had nothing to do with clothing and everything to do with something else. Indeed, because that conclusion is based in common experience and pragmatic concerns exogenous to the inner workings of the company, it is a conclusion reachable without endeavoring to second-guess the employer's legitimate business judgments. The same holds true here. It is not as though Dominguez had a "right" to work in Green Bay, nor is she attempting to dictate the employer's actions or question its business judgment. Instead, she is simply saying that if the employer's stated reason for the restructuring were legitimate, it would have been logical to offer her a job in Green Bay rather than terminate her outright. Because that did not occur, Miller's stated reason is less credible.

27

Thus, although a close question, I find that these critiques of the company's stated reasons could, if believed, allow a jury to reasonably doubt H.C. Miller's explanation. The contrast with the other plaintiffs is instructive. The other plaintiffs in this case failed to establish pretext because their attacks were directed more to the wisdom of the employer's business decisions rather than the credibility of the stated reasons for those decisions. For instance, several claimed that other employees were less qualified (and should have been fired in lieu of them); one claimed that her machine broke down repeatedly, and another claimed he really didn't have an attitude problem. Assuming there is some factual basis to each of the employer's stated reasons (and there is), analysis of these sorts of claims involves weighing the business judgment of the employer rather than the employer's subjective belief, which is the ultimate issue. Of course if the stated reason is truly outlandish in light of the facts presented, a court can step in to conclude that the reason given is not worthy of credence. Otherwise, however, "an employer's decision to favor one candidate over another can be 'mistaken, ill-considered or foolish, [but] so long as [the employer] honestly believed those reasons, pretext has not been shown.'" *Blise v. Antaramian,* 409 F.3d 861, 867 (7th Cir. 2005) (citations omitted).

Dominguez's pretext argument differs in that she does not attack the inherent wisdom of firing her, nor does she compare herself to other employees or argue that the facts do not add up perfectly. She does not say, for example, that the restructuring was a bad idea. Her pretext argument thus does not require this court to weigh the relative merits of other Miller employees, or to assess, in any way, the *correctness* of the firing decision. Instead, she levels her argument at the inconsistencies and/or implausibility inherent in the employer's *own* reasons. Taken in that vein, I conclude that the employer's stated reason makes little sense on its face and, moreover, is

28

undermined by the fact that Miller did not offer Dominguez a job in Green Bay. Were geographic restructuring truly the reason, that would have been the most logical step.

## IV. Conclusion

For the reasons given above, I find that, apart from Dominguez, none of the plaintiffs have produced evidence which would allow a jury to conclude that H.C. Miller's stated business reasons for terminating the plaintiffs was pretextual; several of the plaintiffs have also failed to establish a *prima facie* case of age discrimination. Accordingly, summary judgment is GRANTED in favor of H.C. Miller as to the claims brought by plaintiffs Kulieke, Novak, Lamirande, Neary and Bacovsky. The motion for summary judgment is DENIED with respect to the claim brought by plaintiff Dominguez. The clerk will set this case on for a scheduling hearing.

**SO ORDERED.**

Dated this   26th   day of January, 2006.


s/ William C. Griesbach
William C. Griesbach
United States District Judge